# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **ROBERT RYAN HAASE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:17-cv-00037** |
| | ) | |
| **TAMMY FORD, Warden,** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Respondent** | ) | |

## <u>MEMORANDUM OPINION</u>

The pro se Petitioner is a state prisoner in the Whiteville Correctional Facility serving a forty-year sentence for the attempted first-degree murder of his estranged girlfriend. He seeks a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The Court will deny his petition for the reasons set forth below.

## I.     BACKGROUND AND PROCEDURAL HISTORY

A Marshall County jury found Petitioner guilty on July 20, 2012, of one count of attempted first-degree murder, one count of aggravated assault (domestic abuse), and one count of aggravated assault. (Doc. No. 10-1 at 56–8.) The trial court determined that Petitioner was a multiple offender under Tennessee's criminal sentencing scheme and sentenced him to forty years in prison with thirty-five percent to serve before any eligibility for release on the attempted murder conviction. (*Id.* at 94.) It merged both aggravated assault convictions with the attempted murder conviction. (*Id.* at 95–6.) The Tennessee Court of Criminal Appeals affirmed the judgment on direct appeal, and the Tennessee Supreme Court denied Petitioner's application for discretionary review on May 14, 2014. (Doc. Nos. 10-12, 10-16.)

On November 17, 2014, Petitioner filed a pro se petition for state post-conviction relief.

(Doc. No. 10-17 at 3–40.) The post-conviction court appointed counsel (*id.* at 41–2) and held an evidentiary hearing on the petition on January 22, 2015. (*Id.* at 88.) The court denied relief and dismissed the petition on January 30, 2015. (*Id.*) The Tennessee Court of Criminal Appeals affirmed, and the Tennessee Supreme Court denied discretionary review on August 17, 2016. (Doc. Nos. 10-27, 10-30.)

Petitioner now seeks a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254, and Respondent acknowledges that his petition is timely. (Doc. No. 11 at 2.)

## II. STATEMENT OF FACTS

As set forth in the Tennessee Court of Criminal Appeals' lengthy summary of the evidence, the evidence at trial was that Petitioner and the victim, Lindsey Arp, met as coworkers in 2006 and began dating and moved in together within about seven months. (Doc. No. 10-12 at 13.) By April 2011 they had two daughters together, and the victim's son from a previous relationship also lived with them. (*Id.* at 2.) In the several weeks leading up to the April 11, 2011 incident, the couple's relationship grew turbulent and occasionally violent. (*Id.* at 2, 13–14.) In mid-March, the victim told Petitioner he had to be out of the house by April 30, but later moved the date up to April 15. (*Id.* at 2.) During those weeks, based on having "looked over her cell phone" and other things he noticed, Petitioner grew concerned that the victim was being unfaithful and dishonest with him. (*Id.* at 13–14.) Having been unemployed for more than a year and dependent on the victim's income, food stamps, and health insurance, Petitioner felt stress and pressure in connection with the victim's insistence that he move out. (*Id.* at 2, 14, 17.) He also testified that the victim sexually teased him several times after telling him to move out. (*Id.* at 14–15.) The victim testified that Petitioner repeatedly threatened her during that period, telling her "If I have nothing, you have nothing," that he had "a one-way ticket to jail," and that he would put her body in a wood-chipper.

(*Id.* at 2.) She testified that throughout the course of their relationship, Petitioner had made statements that she perceived as death threats nineteen times. (*Id.* at 4.) She did not report those threats to police, but did call 911 during an "altercation" with Petitioner when she was pregnant in 2009. (*Id.*) Petitioner "settled down" when he knew police were on their way, but the victim testified that after the police left she "got beat up," and learned "not to call the cops on him." (*Id.*) She testified that "[h]e had me living in fear. And the reason I stayed for so long is because he threatened to kill me if I ever left." (*Id.* at 5.) Petitioner denied ever threatening to kill the victim or wanting her dead and said that he "never hit her that many times." (*Id.* at 18.)

Petitioner and the victim testified that the victim kept a deep fryer known as a FryDaddy on her kitchen counter, which was temperature-controlled with a thermostat and used to cook chicken nuggets. (Doc. No. 10-12 at 2–3, 16.) Petitioner was aware that the FryDaddy would not get hot enough to boil oil. (*Id.* at 18.) The victim testified that on the night of April 10, 2011, the FryDaddy was on the counter and "ready to go." (*Id.* at 3.) Petitioner testified that the FryDaddy was dirty and out of oil. (*Id.* at 16, 18.) A police officer who arrived at the scene later testified that there was "very little" oil in the FryDaddy on the counter, and an unopened bag of chicken nuggets was also on the counter. (*Id.* at 7.)

The victim and Petitioner presented divergent accounts of what happened the night of April 10. At some point that evening, the victim programmed a password for her cell phone. (Doc. No. 10-12 at 2, 5.) The Tennessee Court of Criminal Appeals summarized the rest of the victim's version of events as follows:

> The victim arrived home at about 7:00 p.m. on Sunday, April 10, 2011. The Defendant and the three children were there. She changed her clothes and played with the children for a little while. She put the children to bed at about 8:30 p.m. She then began having a conversation with the Defendant while she played music on her cell phone. She stated that the Defendant thought she was recording the conversation with her cell phone, but she was not. The Defendant asked again to

stay in the house. She refused. They "had a shot of tequila together" at the Defendant's suggestion. She explained that they "did a shot to celebrate a new beginning of life." She then began taking family portraits down from the wall because she "didn't want to look at him anymore." They argued about her cell phone, and the Defendant "smacked" it out of her hand. She told the Defendant he had until that coming Friday to get out of the house. The Defendant told her, "If I have nothing, you will have nothing."

The victim went to bed at about 10:00 p.m. She fell asleep after about twenty minutes. She woke up when the Defendant came into the bedroom with her cell phone. He threw her phone into her purse and called her a "fucking bitch." The Defendant then left and closed the bedroom door. This occurred at approximately 2:00 a.m. on Monday morning, April 11, 2011. The victim testified that she did not leave her bedroom after she went to bed.

The victim continued lying in bed but did not fall back asleep. About fifteen minutes later, she heard noise at her door and saw light coming into the room. She looked to see what was happening and saw the Defendant. The Defendant threw a pot of hot liquid on her. The victim testified that the pot was her "Rachel Ray pan," which was big enough to hold six- and-a-half quarts and was larger than the FryDaddy. The pan was admitted into evidence. The victim stated that it normally was kept "[u]nder the cabinet in the kitchen."

The victim testified that, when the liquid first hit her, she thought it was boiling water. The pain was instant and "[e]xcruciating." She jumped up and ran to the kitchen for the landline telephone. The Defendant stayed in the bedroom and did not say anything to her. When she got to the kitchen, the phone was not in its place. She ran back up to her bedroom, passing the Defendant who was now in the foyer. She found her cell phone but could not get it to work. She stated that, at this point, skin was "falling off" of her and blood was "everywhere."

She ran out the front door and saw the Defendant getting in the van. He called her a bitch and drove away. She went to her neighbor's house for help. Her neighbors, the Newberrys, took her into their house and called 911. The police and medical personnel arrived, and she was flown to Vanderbilt Hospital. She spent 126 days in intensive care. She was transferred to Skyline and was not released from hospital care until September 2011. She had thirteen surgeries and five "procedures." She was anticipating "many more." She still had open wounds that bled. She lost an ear and the vision in one eye. The victim testified that she was still on pain medication at the time of trial. Photographs taken of the victim on April 11, 2011, were admitted into evidence. Additional photographs of the victim, taken on August 24, 2011, were admitted into evidence. The victim stated that "[i]t took [her] six months and six days to actually look in the mirror for the first time."

(Doc. No. 10-12 at 3–4.)

The state court also summarized Petitioner's version of events:

According to the Defendant, the victim was at work on April 10, 2011, and the

4

Defendant's mother had the children. The Defendant used the day to move some of his belongings. The victim arrived back home that evening and the children arrived a short time later. The Defendant and the victim drank some tequila and were having a conversation when she told him that she had gotten the oil changed in their SUV. The Defendant thought this was odd because it was customary for either him or his father to take care of the mechanical work on the family vehicles. He went out to the SUV and looked for a receipt. He testified that he found a receipt for an oil change, but the name on the receipt was Adam Abby. When he asked the victim about it, she told him, "Don't fucking worry about it." He kept trying to ask her questions, but she ignored him. He testified, "So I put the receipt back. I kind of knew about this guy anyway.  It wasn't that big of a surprise at this point."

The Defendant stated that, after they had calmed down, they went to the bedroom. They both lay down and were talking. After some time, he got up and returned to the living room to watch television. The victim stayed in bed as she had to get up early the next morning to go to work.

The Defendant decided to cook some chicken nuggets, something he had done frequently. He took the chicken out of the freezer and placed it on the counter. He explained that he decided to use the Rachel Ray pan because the FryDaddy was dirty and he "didn't feel like cleaning it out." He explained that he had used both pans to fry food in the past. To use the Rachel Ray pot, he needed to fill it with oil "[m]aybe slightly more than half full." The Defendant testified that he put the oil in the Rachel Ray pot so he "could cook the chicken nuggets" and denied that he was planning on pouring the oil on the victim.

After putting the normal amount of oil in the pot, the Defendant turned the stove on. He stated, "It always takes a little bit of time to heat that oil up before you can use it to cook," adding that it took fifteen or twenty minutes. He did not recall what time of the night it was. He returned to the living room and dozed off on the couch. The sound of the smoke alarm woke him up. He rushed into the kitchen, where there was "a lot of smoke." He "put the oven mitts on so [his] hands wouldn't get burned," and took the pot off of the stove, moving it to the countertop. In the process, he spilled some of the oil on one of his legs, burning himself.  At that point, he heard "somebody laughing."  The Defendant continued:

> And I looked over there, and that is when I noticed [the victim] over there on the other side of the kitchen, laughing at – she thought it was funny that I got burned and was chuckling and called me a stupid fuck.

> She said something else.  I don't know.  I think it was another sexual comment or something, something sarcastic.

> And she proceeded back to the bedroom.

At that point, the Defendant testified,

> I lost control. I had never felt quite like that before. I just think it has to do with this – my whole stress for the last couple of weeks. Under the pressure I was in, I believe I was in – not a normal – I was not in

a normal state of mind.

I had been drinking that evening. I was – I had just woken up from a nap.  I was half sleeping.

A combination of all of that, with – I think what really had made me snap right then was that I had got burned and hurt, and she thought that was funny.

Then she cursed me. And she is still playing her little sexual teasing games with me all at that time.

I lost all sense of control. I immediately followed her up to the room, right behind her. I opened the door. She was getting back into the bed. It was dark. I just – when I went to the door, I just flung the remaining contents of what was in that Rachel Ray pot.

And when I heard her holler out in pain, it kind of made me snap out of whatever I was – whatever had happened. And at that point, I panicked. I didn't – I realized what I had did [sic]. I didn't know what to do at that point. I was very frantic at that point.

I threw the pot on the floor. Just left – I ran out of the house. I knew that I did something I was going to be in trouble for. I knew that I needed to get her some type of help.

And I went down a couple of stairs, and I threw the oven mitts down in the living room. I went out. I got in our family van. And I tried to go tell the police to go help her and tell them what I did.

The Defendant denied that he was trying to kill the victim when he threw the oil on her. He stated, "I didn't have any particular reason or plan to do that. It's kind of something that just – just sporadically [sic] happened."  He also denied calling or mouthing "Bitch" as he got in the van to leave. He also denied having ever threatened to kill the victim. He denied having any idea that the oil would cause the types of injuries that the victim suffered. He did not know that the oil could have killed her. He testified, "I had no idea what kind of damage would occur."

The Defendant testified that, when he arrived at the Sheriff's office, he told the dispatcher, "Please send some help to 434 David Avenue" and told her what he had done. She told him that there was already help en route. He testified that he was "very much sorry" for having "hurt somebody really bad."

On cross-examination, the Defendant admitted that he had put about five quarts of oil in the Rachel Ray pot. When he responded to the smoke alarm, he saw that the oil in the pot was boiling. He acknowledged knowing "how bad that burns" when grease from frying bacon landed on skin. He stated that he assumed the hot oil "would burn somebody. [He] just had no idea of the severity of the burn."

Asked what he was thinking at the time he picked the pot up and turned toward the stairs, the Defendant stated that he did not know and did not remember. He added, "I don't remember nothing at all.  Like I said, I kind of blanked out.  When I lost control, I just – " On further questioning, the Defendant testified, "I guess I intended

to hurt her.  I never intended to kill her at all.  I know that."  He added:

> I hadn't realized what I had did [sic] until after I had thrown the oil towards [the victim], and I heard her holler out in pain.
>
> Right then is when I realized what I just did, what had happened. That is the first time I remember thinking.

(Doc. No. 10-12 at 16–18.)

The victim's next-door neighbor, Tom Newberry, testified that he and his wife were awakened around 2:30 a.m. on April 11, 2011, by the victim's beating on their front door. (Doc. No. 10-12 at 5.)  He said that the victim appeared to be hysterical, that the front of her t-shirt was wet and bloody, the right side of her face was badly burned, and that the skin on her right forearm "was hanging like a loose shirt sleeve" with blood and body fluid dripping from her fingers. (*Id.*) Newberry told his wife to call 911 but worried the victim would not survive until the ambulance arrived.  He did not attempt any first aid because he could not think of anything that would help or not "maybe do more harm because of the conditions of her flesh." (*Id.*)  Over defense counsel's objection, Newberry testified that in his 22 year military career, including service in Southeast Asia, he had never seen injuries as bad as the victim's. (*Id.* at 6, 19.)  Peggy Newberry testified that as the victim was beating on their front door the morning of April 11, she was yelling for help. (*Id.* at 6.)  When the Newberrys opened the door, Mrs. Newberry saw that the victim's face, arm and legs were "all red," that the skin on her arm was hanging down, and that her skin looked "melted." (*Id.*)

Lewisburg police officer Clyde Ragsdale arrived minutes after the 911 call and described the victim as he found her on the Newberrys' front porch:

> I noticed that her face had been – her skin was just boiled, looked like it had been boiled off of her face, melted off of her, her skin hanging off of it. Her lip was swollen.
>
> Pretty much the whole front side of her body had some type of burn to it, from about her kneecaps, all of the way up her thighs, her right thigh, her arms, her skin hanging off of her arms.

. . . .

You could tell that she was burned underneath her shirt, her neck.

. . .

Just, the right side was the worst. It [her skin] was just hanging off. Her skin hanging off of her left hand. It looked like the skin was completely gone off of the top of her right thigh, and it was bleeding. Her face was just, and especially her neck, I remember seeing her neck was like peeled back.

(Doc. No. 10-12 at 6–7.) Over defense counsel's objection, Officer Ragsdale testified that he had never seen injuries like that in his two and a half years as a police officer. (*Id.* at 7, 20.) The victim complained of pain while she waited for the ambulance. (*Id.* at 7.) After the ambulance arrived and transported the victim from the scene, Ragsdale went next door to the victim's house, where he smelled burned oil in the air. He saw smoke in the house, two oven mitts in the floor near the entrance to the living room, and oil all over the top of the stove and in the floor. (*Id.* at 7.) The unplugged FryDaddy with very little oil and an unopened bag of chicken nuggets were on the kitchen counter. (*Id.*) In the bedroom, Ragsdale found a silver pot with orange handles on the floor, an apparent oil stain on the carpet, and oil on the bed headboard, pillows, and comforter. (*Id.*) Near the headboard he saw "a large stain, kind of yellowish-orange in color," and there was still smoke rising from the bedding. (*Id.*) Photographs that Ragsdale took of the victim and the crime scene were admitted into evidence. (*Id.*)

Lewisburg police officer Amanda Binkley was on her way to the scene when she was informed that Petitioner was crying in the floor at the sheriff's office. (Doc. No. 10-12 at 7.) She continued to the scene and testified that the victim complained of difficulty breathing and seemed to be struggling to breathe, and she described the victim's appearance:

She had very extensive scalding. Her face was swollen and had turned grayish-white. Her lip was swollen.

She had – her skin – there was skin hanging off of both arms. There was big red spots on her. Her shirt was melted into her chest area.

She had a large round red spot that was – her skin was completely gone.

(*Id.* at 8.)

Marshall County Sheriff's Office dispatcher Carol Binkley testified that Petitioner entered the lobby at the Sheriff's Office at approximately 2:30 a.m. on April 11, 2011. (Doc. No. 10-12 at 8.) He appeared to be upset and reported to her that he had just poured hot grease on his wife. He told her his name and the location of the incident, then sat down in the floor crying for several minutes until officers arrived, handcuffed him, and took him away. (*Id.*)

Lewisburg police officer Anthony McLean testified that he spoke to Petitioner in the Sheriff's Office lobby, where he initially saw him sitting on the floor. (Doc. No. 10-12 at 8.) In response to questions from Officer McLean, Petitioner said "My life is over," and explained "My wife wants a divorce, she wants to take the kids, the car." (*Id.*) The Tennessee Court of Criminal Appeals summarized the rest of McLean's testimony:

> The Defendant then told Officer McLean that "he goes to work and he comes home and he gives her his whole check, and he has lost his job, and now he has been declared a diabetic." The Defendant added that "she had told him he could stay a month, and then she changed it and told him he had to leave Friday." Officer McLean testified that the Defendant "made a comment that she had told him that they would never have sex again, and that she came downstairs and started rubbing on herself and said, You will never get this again." The Defendant "stated that he didn't want to hurt her, but he poured hot water on her." Officer McLean testified, "[The Defendant] said he was in the kitchen, cooking chicken nuggets, when she came downstairs." The Defendant "stated that after she came downstairs, rubbing herself, that she went back upstairs. And that is when he lost it, and he went upstairs and poured the hot water on her." The Defendant told him, "When you are in a relationship, you are supposed to make up, not break up, and the family is supposed to stay together." The Defendant told Officer McLean that, after he poured the hot liquid on the victim, he drove himself to the Sheriff's Office. After the Defendant finished his explanation, he "put his hands out and said, I am ready to go." Officer McLean handcuffed the Defendant and took him to the jail.

(Doc. No. 10-12 at 8–9.)

At around 4:48 a.m. on April 11, Lewisburg police detective Scott Braden advised Petitioner of his *Miranda* rights and obtained a waiver of those rights. (Doc. No. 10-12 at 9.) Petitioner told Braden that he had drunk tequila and smoked marijuana earlier but that he was not

feeling the effects of either, and Braden testified that Petitioner seemed lucid and coherent and not

under the influence of drugs or alcohol. (*Id.*)  Petitioner then provided the following written

statement:

> About two weeks ago [the victim] and I got into a fight at the house. I slapped her
> in the side of the head and she hit me in the leg with a step ladder.  Things have
> been bad since then.  She told me that I had to April 30 to get out and then it got
> shorter and shorter.  She told me last night that I had to be out last night. This has
> been hard for me to digest. She has been taking all the pictures with me in it down.
> She would say things like "I'm going to put something else there." She has been
> sexually teasing me for awhile. She would touch herself and me and say I know
> you want it but you can't have it. Yesterday (4-10-11), [the victim] was at work and
> I was at the house alone. My mom had the kids and I was trying to move my stuff
> to my dad's place. [The victim] got home around 8:00 pm and we had a drink, a
> double shot of tequilla [sic]. We were having conversation and she would say things
> to me like she was trying to get me to incriminate myself. She was trying to record
> the conversation with her phone. I slapped the phone out of her hand. She went
> haywire on me and said I hit her. I told her no I didn't hit you, I just slapped her
> phone. I was begging her to give me to the 30th to get out. I told her I would even
> sleep in the garage. [The victim] went to bed around 10:00 pm to 11:00 pm. I went
> up to her bed about thirty minutes after she went to bed and layed down beside her.
> I layed in the bed with her for about thirty minutes and couldn't go to sleep so I
> went back downstairs and started watching tv.  I needed something to eat so I was
> going to fry some chicken. I started to warm up the oil in a pan on the stove. I went
> to the livingroom and had a couple more shots of tequilla [sic] and was smoking a
> cigarette. I do[z]ed off while watching the tv waiting on the oil to warm up. I woke
> up and smelled the smoke and think I heard the smoke detector going off. I went
> into the kitchen and turned off the stove eye and cleaned some of the grease up. As
> I was cleaning up the mess, [the victim] came downstairs and said what are you
> doing. She then looked at me and said "you stupid fuck." After she called me a
> stupid fuck she was starting to go back upstairs and she stopped and put her hand
> in her panties and touched herself and said some sarcastic sexual comment about
> me not being able to touch her. She went on upstairs to bed and I snapped and
> followed her upstairs with the pot of oil. When I got to the bedroom, [the victim]
> was in the bed laying down. I didn't say anything to her I just flung the pot of oil at
> her and the bed. I was standing at the foot of the bed. I heard [the victim] yell and
> I immediately left the house and went to the Sheriff's Department and told the lady
> what I had done. I am sorry for what I have done. This statement was written for
> me by Det. Scott Braden and is true and correct and I approve it as my own.

(*Id.* at 9–10.)

The victim's treating physician, Dr. Jeffery Scott Guy of Vanderbilt University Medical

Center, testified about the extent and severity of her injuries. (Doc. No. 10-12 at 11–12.) He said that she suffered deep third-degree burns on forty-five percent of her body, which would have likely caused death within 48 to 72 hours without immediate medical response. The first weeks of the victim's treatment were devoted to "keeping her body from 'try[ing] to shut down and die.'" (*Id.* at 11.) Dr. Guy estimated the victim's likelihood of dying from her injuries at that point at around 68 percent, and he had advised the victim's mother that she was more likely to die than to live. (*Id.* at 11; Doc. No. 10-4 at 90–91, 92.) He said the victim had undergone fifteen operations and eighteen different procedures by the time of trial and that she would need more in the future and would still have permanent injuries and disabilities caused by her burns. (Doc. No. 10-12 at 11–12.) Dr. Guy testified that oil boils at 400 to 500 degrees and is highly viscous, so it causes greater damage than boiling water. (Doc. No. 10-12 at 11.) He testified that a gunshot, stab wound, or even being doused with gasoline and set on fire would be preferable to the burns the victim suffered, which were consistent with being doused with boiling oil, and that the pain associated with such burns was "excruciating." (*Id.*) On cross-examination, Dr. Guy testified that boiling oil has been used as a lethal weapon since the dark ages, and that its "lethality" was not something it was necessary to learn in medical school or surgical training. (Doc. No. 10-12 at 12; Doc. No. 10-4 at 123.)

Petitioner's mother testified that she was at the victim's house on the evening of April 10, 2011, and that the victim was "going on and on" about how happy she was that Petitioner was finally moving out. (Doc. No. 10-12 at 12.) Petitioner's mother testified that he looked hurt at that time. (*Id.*) She also testified that during a conversation with the victim within a few weeks of trial, the victim had said that when the victim saw Petitioner with the pan at the stove she thought he was boiling water. (*Id.*) The victim testified on rebuttal that she and Petitioner's mother were

never in her home at the same time on April 10, and that she had not told Petitioner's mother that she thought she saw boiling water on the stove that night. (*Id.* at 19.)

### III. ISSUES PRESENTED FOR REVIEW

The petition asserts four claims for relief:

1. There was insufficient evidence to support a finding of premeditation. (Doc. No. 1 at 15.)

2. The trial court erred by admitting testimony about the severity of the victim's injuries and by classifying him as a Range II multiple offender for sentencing. (*Id.* at 18.)

3. The prosecutor committed misconduct during closing argument. (*Id.* at 21.)

4. Counsel was ineffective before trial for failing to advise Petitioner that he would be classified as a Range II offender if he went to trial. (*Id.* at 23.)

### IV. STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained,

AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather,

the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and

every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412,

418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V.     ANALYSIS AND DISCUSSION

### A.  CLAIM 1 – SUFFICIENCY OF THE EVIDENCE

In his direct appeal, Petitioner exhausted a claim that there was insufficient evidence of premeditation to support his conviction for attempted first-degree murder. (Doc. No. 10-10 at 13–17.) The Tennessee Court of Criminal Appeals rejected that claim on its merits:

The Defendant contends that the evidence was not sufficient to support his conviction of criminal attempt to commit first degree premeditated murder. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id.* (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. *Id.*

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. *State v. Winters*, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). A premeditated killing is one

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). Premeditation is a question of fact for the jury to determine after considering all of the proof. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).

Our criminal code further provides as follows regarding criminal attempt:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> > (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
> >
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> >
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

*Id.* § 39-12-101 (2010). FN4

> FN4    The count charging the Defendant with attempted premeditated murder alleged that he
>
> > acted with intent to complete a course of action or cause a result that would have constituted the offense of the First Degree Murder of [the victim] under the circumstances surrounding the conduct as the said [Defendant] believed them to be, and the conduct constituted a substantial step toward the commission of the offense of the First Degree Murder of [the victim] . . . .

The trial court instructed the jury as follows:

> Any person who attempts to commit a criminal offense is guilty of a crime.
>
> For you to find a person guilty of Attempted First Degree Murder, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant intended to commit the specific offense of First Degree Murder of Lindsey Charlene Arp; and

(2) that the defendant did some act intending to complete a course of action or cause a result that would constitute First Degree Murder under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of First Degree Murder. The defendant's actions do not constitute a substantial step unless the defendant's entire course of action clearly shows his intent to commit First Degree Murder.

The trial court then instructed the jury on the elements of first degree premeditated murder. The Defendant has raised no issue contesting these instructions.

The Defendant contends that the proof was not sufficient to prove that he intended to kill the victim or that he threw the oil on her in a premeditated attempt to kill her. His argument rests on the testimony he gave at trial, in which he stated that the victim provoked him into "snapping" and "losing it," causing him to convert his dinner preparations into a weapon for inflicting harm but not death. However, the victim's testimony provided the jury with a very different account of what transpired. According to the victim, whom the jury obviously accredited over the Defendant, she had gone to bed after having an argument with the Defendant over her cell phone. Several hours later, she awoke when the Defendant came into her bedroom, threw her cell phone down, and called her a "fucking bitch." The Defendant then left the bedroom, and she remained in bed. About fifteen minutes later, the Defendant returned with the pot of boiling oil and threw it on her. He then left the house without attempting to render any aid.

Because premeditation requires insight into the defendant's state of mind, a jury may infer the defendant's mental state based on his actions and the surrounding facts and circumstances of the attempted killing. *See State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005). Thus, "[a]lthough a jury may not engage in speculation," *id.*, circumstances that may indicate premeditation include the use of a deadly weapon upon an unarmed victim; lack of provocation by the victim; the accused's declarations of an intent to kill; the accused's failure to render aid to the victim; facts indicative that the accused had a motive to kill the victim; and the particular cruelty of the (attempted) killing. *See State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewing the evidence in the light most favorable to the State, the proof established that the Defendant previously had threatened the victim's life; that the Defendant was jealous and possessive of the victim; that he was angry at being ejected from the victim's home and life and worried about how he would cope without her money, insurance, and food stamps; that, hours after the victim went to bed, he brought a large pot of oil to boiling; that, had he intended only to cook chicken, he could have used the FryDaddy, which heated the oil to a far lower temperature; that he put on oven mitts to handle the pot of oil, indicating that he knew how hot and

dangerous the oil was; that he walked the pot of boiling oil thirty-three feet from the kitchen to the bedroom; and that he flung the oil on the victim while she lay, unarmed, in bed. The Defendant then left the house without rendering aid. This is more than enough circumstantial proof to establish that the Defendant acted intentionally and with premeditation and that his goal was to kill the victim.

The Defendant claims that he did not know that the boiling oil could kill the victim. However, as pointed out by Dr. Guy, "[b]oiling oil is a lethal medieval weapon that has been used since the dark ages." The jury clearly rejected the Defendant's claim of ignorance and clearly rejected the Defendant's claim that he knew only that his actions could harm, but not kill, the victim. Based upon the evidence heard by the jury, the jury was entitled to draw this conclusion.

We hold that the proof was sufficient to support the Defendant's conviction of criminal attempt to commit first degree premeditated murder. Accordingly, the Defendant is entitled to no relief on this basis.

(Doc. No. 10-12 at 22–25.) Respondent asserts that this ruling is not contrary to and does not unreasonably apply federal law. (Doc. No. 11 at 36.)

The right to due process guaranteed by the Constitution ensures that no person will suffer a criminal conviction without sufficient proof. The evidence is sufficient if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The state court accurately identified this standard, and analyzed the evidence presented at trial in light of it. It also correctly applied the rule that a reviewing court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Conatser*, 514 F.3d 508, 518–19 (6th Cir. 2008) (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)).

Habeas review adds yet another layer of deference to the sufficiency analysis. In reviewing such an analysis by a state court in a federal habeas action, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). Witness

credibility assessments are "predominately the business of trial courts," and "federal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (6th Cir. 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Petitioner's argument in support of his claim to this Court consists of a recitation of his version of facts from trial testimony heard by the jury, from which he concludes "it is evident" that his emotional devastation, depression, and lack of coping skills—rather than premeditation—brought about his actions the night of the crime. (Doc. No. 1 at 15–17.) But the state court explained that there was ample countervailing evidence to support an inference that Petitioner was angry and consciously intended to kill the victim, and Petitioner has not offered any basis for finding the state court's decision *unreasonable*. Petitioner's jury clearly determined that his testimony was not credible, despite there being some evidence consistent with it. The state court's deference to the jury's determination, which was supported by the evidence referenced above by the Tennessee Court of Criminal Appeals, was not unreasonable. Particularly in light of the "double layer of deference" this Court must extend on this claim—first to the jury's finding of guilt and then to the state appellate court's finding of sufficient evidence, *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009)—Petitioner is not entitled to relief on this claim.

### B. CLAIM 2 – TRIAL COURT ERRORS

In Claim 2, Petitioner alleges that the trial court violated his constitutional rights by (1) admitting comparative and cumulative evidence of the severity of the victim's injuries, and (2) classifying him as a Range II multiple offender for sentencing. (Doc. No. 1 at 18.) The Court addresses these unrelated claims separately.

1.      Claim 2.1

Petitioner complains that witness testimony, described above, comparing the victim's injuries to injuries the witnesses had seen in their past experience was improperly admitted, and that testimony about her injuries was generally cumulative and prejudicial.  He also complains that such evidence amounted to expert testimony by lay witnesses and invaded the province of the jury. (Doc. No. 1 at 18–20.)  Petitioner appealed the trial court's admission of the evidence in question, and the Tennessee Court of Criminal Appeals denied relief:

### Admission of Irrelevant Evidence

The State elicited testimony from Mr. Newberry that he had retired from the military in 1972 and that he had served in Southeast Asia.  The State then inquired how the victim's injuries compared to what he had seen during his twenty-two years in the armed services. The defense objected on the basis of relevancy. The trial court overruled the objection, and Mr. Newberry answered, "I don't think I have ever seen anything quite come up to that." The Defendant argues that the trial court erred in allowing the State to elicit this testimony because it was not relevant.

We generally review issues regarding the admissibility of evidence under an abuse of discretion standard. *State v. Looper*, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (quoting *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). An abuse of discretion is made out "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)); *see also Looper*, 118 S.W.3d at 422.

We agree with the Defendant that the challenged testimony was not relevant and that the trial court erred in admitting it. FN1 "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. How the victim's injuries compared to the injuries that Mr. Newberry may have seen while in military service had no tendency to make any fact more or less probable in the determination of whether the Defendant was guilty of attempt to commit first degree premeditated murder or either of the assault charges. While we agree with the State that the charge of aggravated assault required it to prove serious bodily injury, *see* Tenn. Code Ann. § 39-13-102(a)(1)(A) (2010), Mr. Newberry's testimony did not clarify the severity of the victim's injuries other than to suggest that they were worse than what he had observed while in the armed services. However, Mr. Newberry did not testify that

he had served in active combat, nor did he testify about what, if any, injuries he actually saw while in the military. Given that Mr. Newberry did not testify about any other injuries he had actually observed, he did not testify about how the victim's injuries actually compared to other actual injuries. Thus, the jury was left to speculate. We hold that the trial court erred in admitting this testimony.

> FN1 We, however, express no opinion as to whether this testimony may have been relevant at the Defendant's sentencing hearing.

The Defendant also objected on the grounds of relevance during Officer Ragsdale's testimony. After Officer Ragsdale described in detail the injuries to the victim that he observed while in her presence before the ambulance arrived, the State asked whether he had "[e]ver seen anything like that before" during his two and one-half years on the police force. The defense objected, and the trial court overruled the objection. Officer Ragsdale responded, "[n]o." Officer Ragsdale did not testify about any other injuries he had actually observed, nor did he testify about how the victim's injuries actually compared to any other injuries he had actually seen.

Again, we agree with the Defendant that the trial court erred in allowing this specific question and answer. How the victim's injuries compared to other injuries that Officer Ragsdale may have seen while a police officer, about which he offered no testimony, was simply irrelevant to the jury's deliberations.

Nevertheless, the Defendant is entitled to no relief on the basis of these errors "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see also State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008). We hold that this very limited erroneously admitted testimony had no effect on the jury's verdict. The extent of the victim's injuries was described to the jury by the victim and other eyewitnesses, including the victim's primary treating physician, as well as through many photographs. Moreover, the victim's presence provided the jury an opportunity to view for itself the result of the injuries inflicted by the Defendant. We are confident that the testimony by a retired serviceman and a relatively inexperienced police officer that they had not witnessed other, equally severe injuries in their professional lives did not impact the jury's decision-making, given the presence of this other admissible evidence. Accordingly, the Defendant is not entitled to relief on this basis.

### Admission of Cumulative Evidence

The defense objected to Mrs. Newberry's testimony about the victim's injuries as cumulative. The defense lodged a similar objection to Officer Binkley's testimony about the victim's injuries. FN2 The trial court overruled both objections. The Defendant contends that the trial court's rulings were erroneous.

> FN2 The record reflects that the officer's full name was Amanda Newcomb Binkley. Although the Defendant refers to her as "Officer Newcomb" in his brief, she testified that she went by the name Amanda Binkley.

Our Rules of Evidence provide that relevant evidence "may be excluded if its probative value is substantially outweighed . . . by considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403. As set forth above, we review a trial court's decision to admit evidence for an abuse of discretion.

The Defendant argues that the State was seeking to improperly stir the jury's emotions by eliciting numerous eyewitness descriptions of the victim's injuries and that Mrs. Newberry's and Officer Binkley's descriptions were "needlessly cumulative" and "served no legitimate purpose." The State responds that these witnesses' testimony "was not entirely cumulative because both women testified regarding details that were not presented by Mr. Newberry's or Officer Ragsdale's testimony." The State also asserts that this testimony assisted it in proving that the Defendant caused the victim to suffer serious bodily injury as required to convict him of the charge of aggravated assault. See Tenn. Code Ann. §§ 39-13-102(a)(1)(A); 39-11-106(a)(34) (2010).

As set forth above, a trial court may exclude relevant evidence if its probative value is "substantially outweighed . . . by considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403 (emphasis added). While we agree with the Defendant that there was considerable overlap in the various witnesses' descriptions of the victim's injuries, we disagree that the somewhat cumulative nature of this proof substantially outweighed the probative value of this evidence. Again, the State was required to prove that the victim suffered serious bodily injury. The State was entitled to put on sufficient proof to establish this element of the crimes with which the Defendant was charged. We hold that the trial court did not abuse its discretion in admitting Mrs. Newberry's and Officer Binkley's testimony about their direct observations of the victim's injuries. FN3 Defendant is not entitled to relief on this basis.

> FN3 We note that the testimony at issue here simply involved the witnesses' direct observations as opposed to the comparative testimony determined to be inadmissible above.

(Doc. No. 10-12 at 19–22.)

Respondent first argues that Petitioner's habeas claims about the trial court's evidentiary rulings are procedurally defaulted because he never asserted in state court any violation of federal constitutional rights in connection with those rulings. (Doc. No. 11 at 40, 43.) As discussed above, federal claims that were not fairly presented in state court are defaulted. But a habeas petitioner "'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993), *overruled in part on*

*other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995). A finding that Petitioner failed to raise a federal claim in state court, therefore, would require some evaluation of the language and citations on which he relied in his direct appeal. Respondent has not discussed or even cited Petitioner's briefs or arguments in state court to support his assertion that Petitioner defaulted this claim. (*See* Doc. No. 11 at 40, 43.)

Because it is more straightforward to turn directly to the merits of Petitioner's claim than to sift through his state court brief to determine whether he preserved his federal claim, the Court considers this claim regardless of its alleged default. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (proceeding directly to merits analysis because "the question of procedural default presents a complicated question . . . and is unnecessary to our disposition of the case"); *Ferensic v. Birkett*, 451 F. Supp. 2d 874, 887 (E.D. Mich. 2006) (performing de novo review of unexhausted habeas claim because "it is easier to address the merits of Petitioner's claim than to perform a procedural default analysis").

A state court evidentiary ruling only rises to the level of a federal due process violation when it is "so egregious that it results in a denial of fundamental fairness" or "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (quoting *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)). In this case, the state court found that the comparative injury testimony, although "erroneously admitted" as a matter of state evidentiary rules, had no negative impact on the outcome of Petitioner's trial and that the value of the allegedly cumulative evidence was not outweighed by any prejudice. That holding was not unreasonable. It is indisputable that

the victim's injuries were horrific,[1] and hearing less evidence about the severity of the injuries would not have caused the jury to reach a different conclusion about that fact.

Petitioner has not cited any Supreme Court opinion establishing that the state court ruling was unreasonable or otherwise demonstrating that admission of the evidence in question was egregious or offensive to the fundamental principles of justice. Moreover, even if Petitioner had succeeded in proving a constitutional violation, there is no basis on which to find that it "had substantial and injurious effect or influence in determining the jury's verdict," as required to merit habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Accordingly, Petitioner is not entitled to relief on Claim 2.1.

2.      Claim 2.2

Petitioner also asserts in Claim 2 that the trial court erred by classifying him as a Range II multiple offender under state law without proof that his prior offenses were not committed in the same 24-hour period. (Doc. No. 1 at 20.) On direct appeal in state court, Petitioner argued that his Range II classification was erroneous because a prior Michigan conviction should have been graded as a misdemeanor rather than as a Class C felony. (Doc. No. 10-10 at 27–29.) Accordingly, his claim based on the 24-hour theory was never fairly presented in state court and is procedurally defaulted.[2]

---

[1] In fact, defense counsel acknowledged during closing argument the "horrific nature" of the injuries and again during Petitioner's sentencing hearing that "the injuries on Ms. Arp are phenomenal. They are just phenomenal. We can't escape that. It is obvious." (Doc. No. 10-6 at 64; Doc. No. 10-8 at 70.)

[2] The Court has considered Petitioner's conclusory assertion that he overcomes the procedural default of any of his claims pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (*See* Doc. No. 1 at 29.) But *Martinez* does not apply to this claim of trial court error because it is strictly limited to claims of ineffective assistance of trial counsel. *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

Moreover, Petitioner relies exclusively on Tennessee law as the basis for his 24-hour theory.[3]  Claims that a state court's sentencing decision violated state law are "not cognizable on federal habeas review." *Noonan v. Burton*, No. 17-2458, 2018 WL 6584905, at *3 (6th Cir. Oct. 15, 2018) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)); *see also Abu-Jebreel v. Palmer*, No. 17-2518, 2018 WL 3064296, at *2 (6th Cir. May 9, 2018) (holding that "claims concerning the state court's application of Michigan's sentencing guidelines are state law issues not cognizable in federal habeas review") (citing *Hutto v. Davis*, 454 U.S. 370, 373–74 (1982)).  In the absence of "misinformation of constitutional magnitude" underlying his sentence, which Petitioner has not alleged, he cannot establish that the sentencing process violated his right to due process. *Abu-Jebreel*, 2018 WL 3064296, at *2 (citing *Roberts v. United States*, 445 U.S. 552, 556 (1980)).

And finally, as Respondent correctly points out, the state court record clearly demonstrates that there is no merit to Petitioner's claim even if it were subject to habeas review.  The prosecution's Notice of Enhancement asserted that three prior Michigan convictions warranted an enhanced sentence in this case: a June 20, 1995 conviction for second degree home invasion in case number 95-005427-FH(c); a January 6, 1997 conviction for possession with intent to deliver marijuana in case number 96-148705-FH; and a January 6, 1997 conviction for delivery of less than 50 grams of cocaine in case number 96-148706-FH. (Doc. No. 10-9 at 31, 33, 45–46.)  At the sentencing hearing, the state abandoned any reliance on the marijuana conviction and asserted only the home invasion conviction and the cocaine conviction as qualifying convictions to classify Petitioner as a Range II multiple offender. (Doc. No. 10-8 at 49–52.)  The trial court agreed that

---

[3] Specifically, Petitioner cites, *inter alia*, Tennessee Code Annotated § 40-35-106(b)(4), which provides that, with certain exceptions, "convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions."

Petitioner was a Range II multiple offender based solely on those two convictions. (*Id.* at 56–59.) The Michigan records entered into evidence at the sentencing hearing establish that Petitioner was convicted and sentenced to 270 days in the home invasion case on May 1, 1995, and that the date of his cocaine offense was September 30, 1996. (Doc. No. 10-9 at 33, 46.) Accordingly, his assertion that the state failed to prove that the offenses did not occur within a 24-hour period or result in separate periods of incarceration (Doc. No. 1 at 20) is factually frivolous.

Claim 2.2 is procedurally defaulted and would fail on its merits even if it were subject to review. Petitioner is not entitled to relief on this claim.

## C. CLAIM 3 – PROSECUTORIAL MISCONDUCT

Petitioner asserts that the prosecutor engaged in misconduct that violated his right to a fair trial by telling the jury in his closing argument that lesser-included offenses were only included in the jury charge because the trial judge's "bosses"–state appellate and federal courts–required the trial judge to include them and by saying that what happened to the victim was worse than murder. (Doc. No. 1 at 21–22.) He raised that same claim on direct appeal, and the Tennessee Court of Criminal Appeals found he was not entitled to relief:

> Although trial courts possess substantial discretion in determining the propriety of closing arguments, they must restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130- 31 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). In making their closing arguments, both parties must be temperate and must predicate their arguments on evidence adduced at the trial. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). Additionally, summations "must be pertinent to the issues being tried." *Id.* (internal quotation marks omitted). Prosecutors, particularly, must proceed with caution due to their special role in the criminal justice system. *See Hill*, 333 S.W.3d at 131 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). "The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.*
>
> This Court previously has recognized five general areas of prosecutorial misconduct during closing argument:
>
> > 1. It is unprofessional conduct for the prosecutor intentionally to

28

misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)) (citations omitted).

However, even if the record demonstrates prosecutorial misconduct during closing arguments, this Court will not grant a new trial on this basis unless it is "so inflammatory or improper as to affect the verdict." *Hill*, 333 S.W.3d at 131 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In determining whether the State's argument improperly prejudiced the defendant and affected the verdict to the defendant's detriment, this Court considers the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also State v. Scarborough*, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009).

As to the first of the contested remarks made by the prosecutor in this case, the State concedes in its brief that "the prosecutor's comments may not have been artfully worded – particularly the use of the term 'bosses' to describe members of the appellate courts." We agree. We also agree with the Defendant that the prosecutor engaged in misconduct when he told the jury that what the Defendant did to the victim "was worse than murder." However, we disagree that either

challenged aspect of the State's closing argument was so improper as to entitle the Defendant to a new trial.

Turning to the *Judge* factors, the facts and circumstances of this case strongly favored the prosecution. As indicated above, the only contested issue in this case was the Defendant's state of mind at the time he threw the hot oil on the victim. The prosecution and the defense presented the jury with two very different scenarios from which to choose, and the success of either side depended upon the jury's assessment of the victim's and the Defendant's credibility. Clearly, the jury determined that the victim's testimony was more credible than the Defendant's. The victim's testimony was more than sufficient to establish that the Defendant acted with premeditation and with the intent to kill her when he threw at least five quarts of boiling oil on her while she lay, defenseless, in bed.

Turning to the next factor, the trial court overruled the Defendant's objection to the prosecution's argument about lesser-included offenses. Accordingly, no specific curative measures were taken at that point. However, the trial court properly instructed the jury on all of the lesser-included offenses required under the proof of this case. The trial court also properly instructed the jury that it was not to consider any lesser-included offense unless and until it determined, unanimously, to acquit the Defendant of the charge of criminal attempt to commit first degree premeditated murder. *See State v. Davis*, 266 S.W.3d 896, 905-08 (Tenn. 2008); Tenn. R. Crim. P. 31(d)(2). The trial court also explained to the jury that closing arguments were not evidence. We presume that the jury followed its instructions. *See State v. Jordan*, 325 S.W.3d 1, 66 (Tenn. 2010).

As to the prosecutor's later comment that the Defendant's crime was worse than murder, the trial court impliedly sustained the objection and cautioned the prosecutor as set forth above. The prosecutor then continued, "This case, ladies and gentlemen, is about attempted first-degree murder, period," and began to argue about the Defendant's testimony and credibility.

The third *Judge* factor examines the intent of the prosecutor in making the allegedly improper argument. As to the first of the contested remarks made by the prosecutor in this case, it is clear that the prosecutor was attempting to clarify for the jury that the trial court's instructions on lesser-included offenses were not an implied comment on the evidence but, instead, were required to be given. As to the comment regarding the severity of the victim's injuries, however, this was not a contested issue in this case. We agree with the Defendant that the prosecutor's comment on this issue served the purpose of attempting to inflame the jury's emotions, an inappropriate use of closing argument. *See Goltz*, 111 S.W.3d at 6.

The fourth *Judge* factor examines the cumulative effect of improper argument and other errors. We have held that the trial court erred in allowing Mr. Newberry and Officer Ragsdale to testify about how the victim's injuries compared to other injuries they had seen in their careers. Nevertheless, this error was minor when considered in the context of the rest of the State's proof. This evidentiary error added little to the impact of the improper argument under consideration. Thus, this factor does not support a finding that this improper argument affected the jury's

verdict.

The relative strength or weakness of the case is the final *Judge* factor. As already indicated, the State's case against the Defendant was strong. The victim testified about the Defendant's previous threats and physical abuse. The Defendant himself admitted to (1) choosing a pot instead of the temperature-regulated FryDaddy in which to heat the oil; (2) heating the oil to the point of boiling; (3) donning oven mitts to pick up the pot because he did not want to get burned; and (4) carrying the pot over thirty feet to the victim's bedroom. Once in the bedroom, he deliberately threw the pot of boiling oil on the victim as she lay helplessly in bed. The Defendant, by his own admission, then left the house and the screaming victim without rendering any aid or attempting to summon medical help. The Defendant's defense was two-pronged: (1) the victim provoked him such that he snapped and did not act with premeditation, and (2) he did not intend to kill her and did not know that five quarts of boiling oil could cause death. That is, the Defendant did not take issue with the State's proof about the victim's injuries, but rather defended on the basis that he did not act with the requisite culpable mental state.

While the defense focused on convincing the jury that the Defendant committed some lesser crime than criminal attempt to commit first degree premeditated murder, the proof was more than enough to allow the jury to reject the Defendant's theory. We hold that the State's improper closing argument simply was not so significant as to entitle the Defendant to a new trial. Accordingly, the Defendant is not entitled to relief on this basis.

(Doc. No. 10-12 at 26-30.)

In federal claims of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted) (denying relief on the basis of inflammatory prosecutorial argument). To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.* Accordingly, if a court finds improper conduct, it must consider four factors to determine whether the challenged conduct is flagrant: "(1)

the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.*

Although the Tennessee Court of Criminal Appeals did not directly cite *Darden* or any other federal court opinion setting forth the applicable federal standard,[4] the analysis it employed was nevertheless consistent with that standard, including consideration of the strength of the case against Petitioner and whether the alleged misconduct negatively impacted the jury verdict. And "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise." *Key v. Rapelje*, 634 F. App'x 141, 146 (6th Cir. 2015) (quoting *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006)). Under these standards, the state court's conclusion that the limited misconduct in this case did not rise to the level of warranting a new trial was not unreasonable, and Petitioner has not cited any Supreme Court opinion establishing that it was. The prosecutor's improper argument consisted of two isolated comments (Doc. No. 10-6 at 22, 26, 28) in an initial closing argument that comprised more than 30 pages of transcript. (*Id.* at 19–52.) He is not entitled to relief on this claim.

E.  CLAIM 4 – INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner alleges that his trial counsel was ineffective for failing to determine and advise him, at a time when he could have accepted a plea offer for 20 years, that he would be classified as a Range II offender with a potential sentence range of 25 to 40 years if he was convicted of

---

[4] AEDPA does not require the state court to discuss or even cite applicable Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

attempted first-degree murder at trial. (Doc. No. 1 at 23–27.)  Petitioner exhausted this claim in post-conviction proceedings, where the state courts denied him relief. (Doc. Nos. 10-17, 10-27.)

1.  Standard of Review for Ineffective Assistance Claims

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687.  To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688, 689.

The "prejudice" component of an ineffective-assistance claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Logan v. United States*, 910 F.3d 864, 869 (6th Cir. 2018) (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)).  Petitioners in such cases must also establish a

reasonable probability that the trial court would have accepted the terms of the plea and that the petitioner's conviction and/or sentence would have been less severe. *Haney v. Jackson*, No. 18-1841, 2019 WL 301152, at *2 (6th Cir. Jan. 4, 2019) (citing *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)).

The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted).

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Richter*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is

a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

### 2. Relevant facts

As discussed above, the prosecution's sentence enhancement notice asserted that three prior Michigan convictions constituted predicate offenses to make Petitioner a Range II offender. (Doc. No. 10-9 at 31, 33, 46.) Under Tennessee law, Petitioner would be a Range II offender if he had two to four "prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." Tenn. Code Ann. § 40-35-106(a)(1). Tennessee law explains how out-of-state convictions must be evaluated to determine whether they count in this analysis:

> Prior convictions include convictions under the laws of any other state, government or country that, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

Tenn. Code Ann. § 40-35-106(b)(5). Accordingly, William Harold, one of the assistant public defenders who represented Petitioner for the first eight months of his case, agreed at his post-conviction hearing that "the State has to go through certain hoops when they have out-of-state convictions to show that the elements of out-of-state convictions match the elements of a felony crime in state before [it] can enhance someone's punishment in a conviction." (Doc. No. 10-18 at 35.) Trial counsel Hershell Koger also testified that "you can't just typically look at something from Michigan that they call it, you know, offense X and know that that's going to be offense X under Tennessee's sentencing procedures." (*Id.* at 66.) Trial counsel in this case argued at Petitioner's sentencing hearing that the cocaine conviction should only be graded as a

misdemeanor under Tennessee law and not counted as a prior conviction supporting a Range II classification (Doc. No. 10-8 at 53–54), and, as discussed above, Petitioner appealed the trial court's ruling on that point. (*See* Doc. No. 10-12 at 31–32.)  Depending on the nature of a defendant's out-of-state conviction, therefore, it can be a challenge for attorneys to predict—or to advise clients definitively about—how a Tennessee judge will classify the offense in the multiple offender analysis.

Harold testified that of the three Michigan convictions listed on the state's enhancement notice, the second-degree home invasion conviction would equate to aggravated burglary in Tennessee and would count as a prior offense, and the marijuana conviction would be classified too low to count. (Doc. No. 10-18 at 22.)  Whether Petitioner would be deemed to be a Range II offender thus depended on how the trial court would classify the other drug conviction.  It was unclear to defense counsel, however, whether that conviction would count, because the actual judgment in that case did not specify what drug was involved.[5] (*Id.* at 22–23, 58; Doc. No. 10-9 at 45.)  Accordingly, Harold and Michael Collins, the other assistant defender originally on Petitioner's case, testified that they advised Petitioner that the court could find him to be either a Range I or Range II offender and discussed the sentence ranges that came with both classifications. (*Id.* at 23, 35, 47–48, 58.)  Harold testified that over the course of their 8-month representation, they "had spent a fair amount of time . . . discussing potential settlements with him and what each charge could carry, including that he could potentially be a Range II," and when they discussed the possibility that he might be a Range II offender, "he seemed to understand the discussion." (*Id.* at 32, 35–36.)  Both counsel testified that they discussed potential sentences with Petitioner "from

_____

[5] The General Information underlying that conviction, later filed at Petitioner's sentencing hearing in this case, specified that the drug involved was cocaine. (Doc. No. 10-9 at 46.)

the very beginning" of their representation of him, and "for a long time" before December 7, 2011, when one of the prosecutors offered a plea deal for 20 years for attempted first-degree murder. (*Id.* at 30, 32, 57.) They both also testified that they begged Petitioner to take that deal, because they believed he faced a worse sentence if he refused. (*Id.* at 37, 60.)

According to counsel, Petitioner rejected the 20-year deal because he remained adamant, as he had been since the beginning of the case, that he had not intended to kill the victim and would not agree to anything higher than a 12-year sentence for aggravated assault. (Doc. No. 10-18 at 23–24, 25, 26, 39, 40, 57.) Counsel testified that after "a lot of discussion," Petitioner finally agreed to a potential plea to second degree murder, so with Petitioner's permission, counsel countered with an offer of 12 years for attempted second degree murder, which the prosecutor rejected. (*Id.* at 23, 25, 26, 32, 40-41.) The prosecutor indicated that his 20-year offer for first-degree murder was a "take it or leave it" deal and that he was not going to agree to anything lower. (*Id.* at 33, 42, 51.) Counsel also discussed with Petitioner the possibility of offering 15 years for first-degree murder, because they "were trying to get – get him to make any type of offer on first-degree murder," but "he would not go up to that charge" and "seemed to not go above 12" years. (*Id.* at 49.)

The district public defender testified that she had followed Petitioner's case to some extent and that she was aware that the assistants on his case had been frustrated by his refusal to consider any plea other than to aggravated assault. (Doc. No. 10-18 at 113–14.) She was present for some of the discussion with Petitioner on December 7 about the prosecutor's 20-year deal, and she testified that "Mr. Haase just was not going to plead to anything that involved attempted first-degree murder." (*Id.* at 115.) She testified that she warned Petitioner that, for a variety of reasons, by January the state would be unwilling to agree to anything less than "a maximum offer." (*Id.* at

116–17.) She "was very concerned that if Mr. Haase did not take that offer on that day that he would be going to trial after that." (*Id.* at 117.) The same day that Petitioner rejected the 20-year offer, the case was set for trial. (*Id.* at 24.)

Approximately two weeks after the failed plea negotiations, the public defender's office withdrew from Petitioner's case for unrelated reasons, and Hershell Koger was appointed to represent him. (Doc. No. 10-18 at 26, 63.) Koger testified that Petitioner mentioned during their discussions that the state had offered a 20-year deal, but from the time he entered the case Koger "understood clearly this case was for trial" and that Petitioner's options were to go to trial or enter an open plea. (*Id.* at 65.) He testified that he had some conversation with the district attorney and knew that the state was "not settling [the case] on anything short of that." (*Id.* at 68.) In the approximately six months of Koger's representation of Petitioner leading up to trial, his "focus was always trial, get ready for trial." (*Id.* at 65.) Koger testified that he was unsure whether previous counsel had specifically told him that Petitioner might be a Range II offender: "They may have said Range II. I can't say if they did or didn't." (*Id.* at 73.) It was only a week or two before trial, when he began looking into Petitioner's prior convictions in order to prepare for his testimony, that Koger paid attention to the state's previously filed enhancement notice and realized that Petitioner "may very well be Range II." (*Id.* at 65–67.) Koger testified that he "couldn't really do anything with that" information, because there was no plea offer while he was on the case. (*Id.* at 67.) He did contact the district attorney about the earlier 20-year offer and was told "there's no offer in the case right now." (*Id.* at 69.) He testified that even if he had known earlier that Petitioner was a Range II offender, he did not know if he would have done anything differently because he

already knew the prosecutor's position on the case.[6] (*Id.* at 68.) Koger testified that because

Petitioner had to testify at trial, Koger decided not to discuss his Range II classification with him

until after his testimony to avoid having that knowledge "screw him up testifying on the stand" in

the "fragile state" he was in. (*Id.* at 71.) Koger also testified that every time he met with Petitioner

"it was the same thing, I'm not guilty of attempted first-degree murder," and that there was a 2011

memo in the file, from an investigator who had previously worked on the case, that indicated "the

defendant is not willing to plead to attempted first-degree murder, but will consider and may plead

to attempted second-degree murder, 12 years." (*Id.* at 87, 91.)

Petitioner testified that nobody from the public defender's office ever told him that he

might be a Range II offender, and that he "probably" would have taken the state's offer if he had

known. (Doc. No. 10-18 at 96, 99.) He testified that he told Harold and Collins that he would

plead to "no more than 12 years" for second-degree attempted murder. (*Id.* at 96.) He testified that

he was considering counsel's suggestion of 15 years because counsel told him that the prosecutor

"was not going to reduce the charge of the offense," but that he never had a chance to discuss that

---

[6] Petitioner materially mischaracterizes Koger's testimony on this point by asserting that "Had Mr. Koger realized that Petitioner was a Range II offender on the day he got the case, he would have gone back to the DA's office about the 20-year offer." (Doc. No. 1 at 25.) The actual testimony Petitioner cites does not support that assertion:

> Q:    If you had realized he was a Range II at an earlier date, do you think you would have gone back and tried something differently?

> A:    No. I don't – well, you know we can talk hypothetical all day long. . . . If the question is, if I had realized he was Range II the day I got on the case, would I have been begging the DA's office to let us do the 20-year offer, I might have gone back and said something to them again. I don't know if I would quite frankly, because here again, I'm going back to the posture the case was in.

> I mean, I had some discussions with [the district attorney] earlier in this case. It was going to trial. There is – I bet my law license this case is going to trial or we're pleading open. We are not settling it on anything short of that. That was [the district attorney]'s position.

(Doc. No. 10-18 at 68.)

possibility further before his counsel was replaced. (*Id.* at 97.) Petitioner testified that he told Koger that he was "considering" a 15-year deal, but Koger told him the prosecutor was not negotiating at that point. (*Id.*) In response to questioning by the court, Petitioner testified that he never told any lawyer representing him that he was willing to take a 15-year plea deal for attempted first-degree murder. (*Id.* at 98.) He testified that he told his attorneys "numerous times" that he "never tried to take anybody's life." (*Id.* at 104.) During cross-examination about his testimony that he would "probably" have taken the state's offer if he had known he would be a Range II offender, Petitioner agreed that his answer was still equivocal on the day of his testimony. (*Id.* at 106.)

### 3. Analysis

The Tennessee Court of Criminal Appeals correctly identified and summarized the *Strickland* standard for ineffective-assistance claims. (Doc. No. 10-27 at 8.) It summarized the evidence and the post-conviction trial court's ruling and went on to reject Petitioner's claim:

> The post-conviction court found "defense counsel [to be] entirely credible in their version of the facts and what the [Petitioner] was told and when he was told it." Additionally, the court accredited counsel's testimony that the Petitioner refused to plead guilty to attempted first degree murder because he did not intend to kill the victim. The court stated that the Petitioner "made the legitimate if unwise decision to go to trial." Accordingly, the post-conviction court found that the Petitioner failed to establish that his counsel were ineffective. The post-conviction court issued a written order denying the petition. On appeal, the Petitioner challenges the post-conviction court's ruling.
>
> . . .
>
> On appeal, the Petitioner maintains that his counsel were ineffective by failing to inform him that he could be considered a Range II offender if he were convicted at trial. He asserts that this failure influenced his decision to reject the State's offer to allow him to plead guilty to attempted first degree murder with an accompanying Range I twenty- year sentence with release eligibility after service of thirty percent of the sentence. The State responds that the Petitioner's attorneys advised the Petitioner that he was potentially a Range II offender, that he should accept the twenty-year plea offer, and that he faced a potential sentence of forty years as a Range II offender if he were convicted at trial.

The post-conviction court found that the Petitioner's counsel were not ineffective. The post-conviction court accredited the testimony of counsel, finding that the Petitioner was advised that he was potentially a Range II offender. Further, the post-conviction court found that the Petitioner

> was unwilling to accept any offer that the State was actually prepared to make in the case and that this would have been true regardless [of the Petitioner's] beliefs concerning the status of his range. The [Petitioner] was adamant that he did not intend to murder the victim and that he was not going to accept a sentence of more than twelve years. . . . [I]t cannot be said that "but for" the error, the outcome of the case would have been different. The Office of the Public Defender provided information about the danger of the [Petitioner] being found to be Range II, and the [Petitioner] ignored that concern.

The evidence does not preponderate against the findings of the post-conviction court. Petitioner has failed to show that counsel were ineffective.

(Doc. No. 10-27 at 7, 8–9.) The state courts effectively found that counsel's performance was not deficient and that any alleged deficiency did not prejudice Petitioner.

The Court's review of this claim turns on whether the state court unreasonably applied the *Strickland* standard or unreasonably determined the facts relevant to the claim. Petitioner does not offer any support for either of those options. On the deficient performance prong, the state courts determined that counsels' performance was not deficient because the assistant public defenders' testimony that they informed Petitioner of his possible Range II status and the resulting sentence range was simply more credible than Petitioner's testimony that they did not. Petitioner does not cite any Supreme Court precedent or other facts in the record that make that determination unreasonable. That alone is sufficient to defeat Petitioner's claim. But the state court went on to address the prejudice prong and found that the abundant evidence that Petitioner was unwilling to accept any plea deal for first-degree murder or for more than 12 years, and that the state was unwilling to accept anything less than 20 years for first-degree murder, outweighed Petitioner's testimony that he was considering any such deal or that he "probably" would have taken the 20-year deal if he had known about his possible Range II status. Again, Petitioner has not cited any

law or evidence establishing that determination to be so unreasonable that it is beyond fair-minded debate. And finally, to the extent that Petitioner's claim is directed at trial counsel Koger, the undisputed evidence from the post-conviction hearing is that the district attorney was unwilling to engage in any plea negotiation from the time Koger took over the case. Accordingly, Petitioner suffered no prejudice from Koger's allegedly deficient failure to recognize at an earlier date that Petitioner would be subject to Range II sentencing.

Petitioner has not carried his burden of establishing that the state court's rejection of his ineffective-assistance claim was unreasonable. Accordingly, he is not entitled to relief on this claim.

## VI.     CONCLUSION

Petitioner's claims are all either defaulted or fail on their merits for the reasons set forth above. Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order will enter.


_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE